Verlyn G. Marth and Nina T. Marth v. Commissioner.
Marth v. Commissioner
Docket No. 2230-62.
United States Tax Court
T.C. Memo 1964-116; 1964 Tax Ct. Memo LEXIS 219; 23 T.C.M. (CCH) 660; T.C.M. (RIA) 64116; April 29, 1964
*219 Held: Petitioner was not away from home in 1958 while at Edwards Air Force Base. Verlyn G. Marth, pro se, 3197 Cape Verde Place, Costa Mesa, Calif. Herbert T. Ikazaki, for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioners' income tax for 1958 in the amount of $330.73. The only issue before us is whether petitioner Verlyn G. Marth was away from home within the meaning of section 162(a)(2) of the Internal Revenue Code of 1954[1] while employed by Douglas Aircraft Company at its aircraft testing grounds at Edwards Air Force Base, California, during the period *220 January 1, 1958, to August 25, 1958. [2]
Findings of Fact Petitioners Verlyn G. Marth and Nina T. Marth, husband and wife, resided at 44024 Elm in Lancaster, California, during 1958. For 1958, petitioners filed a joint income tax return with the district director of internal revenue at Los Angeles, California. Petitioner Verlyn G. Marth will sometimes hereinafter be referred to as "petitioner." Douglas Aircraft Company (hereinafter sometimes referred to as "Douglas") manufactures aircraft and other airborne articles for various divisions of the Department of Defense of the United States under contracts with the Government, as well as for private, commercial concerns. In 1958, it carried on its manufacturing operations in California at plants located in Santa Monica, El Segundo and Long Beach. Santa Monica is eight miles from El Segundo, and El Segundo is eighteen miles from Long Beach. Douglas also had a manufacturing plant in Tulsa, Oklahoma. Douglas' over-all operations are carried on in several *221 divisions such as research, designing, manufacturing and testing. The headquarters of the testing division is at the Santa Monica plant. It has jurisdiction over various kinds of testing, including flight testing, of prototypes of aircraft in preparation for their manufacture. The United States Air Force for many years maintained in the Mojave Desert in California (117 miles from Santa Monica and 124 miles from El Segundo) a base known as the Edwards Air Force Base, hereinafter sometimes referred to as "Edwards". Lancaster, the nearest sizable place to Edwards, is 31 miles away. Lancaster's population grew from 3,594 in 1950 to 26,102 in 1960. Both the United States Air Force and the Navy required in some contracts with Douglas that flight tests of new and experimental aircraft would be made at certain military bases, including Edwards. Although all of the facilities at Edwards are owned by the United States, certain test, hangar, and support facilities located there were made available to several aircraft manufacturing concerns such as Douglas, Lockheed, Convair, Boeing, North American, Northrop, and MacDonnell. Douglas made flight and other tests at Edwards from 1947 through *222 March 1962 during which period facilities at Edwards were made available to Douglas. At various times, Douglas made additions to such facilities at its own expense. No test facility is maintained by Douglas at Edwards at this time. Prior to 1953, a master plan was drawn by the Air Force, the Navy, and others for the enlargement and modernization of Edwards and the construction of a new and longer runway. Such improvements were planned because of the rapid growth of and new developments in the aircraft industry, the development of planes capable of flying at supersonic speeds, and the expected increase in the use of the base by the Air Force, the Navy, and various contractors. In 1954, the plan was approved. The plan was carried out and it was financed by the Government. Douglas, Convair, and others participated in conferences about the plan with the Department of Defense. The new facilities were first used by Douglas in the early part of 1956. The facilities were withdrawn from Douglas in March 1962. During 1958, Douglas kept several employees, such as base manager, shop manager, mechanics, engineers, a foreman, and tool keepers at Edwards continuously. The petitioner was not *223 one of the above class of Edwards employees who were hired locally. It was Douglas' policy to pay all its testing division employees (excepting Douglas-designated permanent employees) $7 per day, in addition to their regular salaries, when assigned to Edwards from Santa Monica. The $7 per day allowance was called "per diem." Douglas did not withhold any income tax on this per diem. On August 25, 1958, under a plan of reorganization of personnel assigned at Edwards, Douglas adopted the policy of placing certain employees on Field Test Station Assignment Pay, hereinafter sometimes referred to as "FTSAP." FTSAP entitled a salaried employee to an additional 15 percent of his monthly salary up to a maximum $100of per month. On August 25, 1958, petitioner accepted FTSAP status, per diem payments to him were discontinued, and he received FTSAP payments from August 1958 to March 1962. Douglas withheld income taxes from FTSAP amounts paid to its employees. A large percentage, but not all of the employees assigned to Edwards on August 25, 1958, were placed on FTSAP on that date. In general, under contracts with the Air Force and the Navy, the Government reimbursed Douglas for its expenses. *224 In adopting its policy of paying a per diem of $7 per day to its employees during the period they worked at Edwards, Douglas had various discussions with the contracting officers and auditors of the Air Force and the Navy about the propriety, under the Armed Services Procurement Regulations (ASPR), of putting the employees who worked at Edwards on travel status during such assignments, of paying them $7 per day, and of including that expense in the expenses of Douglas for which Douglas was reimbursed by the Government. Regulation 15 of ASPR refers to the reimbursement by the Government of reasonable travel expenses. The Air Force and the Navy accepted Douglas' policy in the payment of a per diem to its employees working at Edwards, and all such per diem expenses have been included in Douglas' charges for its expenses, and have been reimbursed as travel expenses by the Air Force and the Navy. Under Douglas' per diem policy described above, Douglas classified assignments of employees to Edwards (and to other test centers) as a "temporary assignment." At 90-day intervals, it was Douglas' policy to review travel orders and if circumstances of employees' work assignments warranted, an *225 extended travel order was made for an additional 90-day period, or an employee under certain circumstances could work at Edwards for one or two or more years and continue to be classified as temporary. Under this policy, in instances where it was known at the time of making assignment of an employee to Edwards that he would be there for more than three months, his assignment was made for only three months under a travel order with the understanding that the travel order would be extended. If an employee who had been assigned to Edwards moved his family to a town near the base and rented or purchased a home there, such employee continued to be assigned to the base under a 90-day travel order, his order remained outstanding, and he continued to receive a $7 per diem allowance unless he was "permanently" (Douglas designated) assigned to Edwards, was transferred to another test base or, after August 25, 1958, accepted FTSAP status. Douglas knew that some of its employees who worked at Edwards moved their family residences to Lancaster or Palmdale and that some purchased homes there. Nevertheless the travel orders and payments of the per diem allowance were continued. However, Douglas *226 did not pay such employees' moving expenses. Employees who were assigned to Edwards and who did not remove their homes to Edwards also received per diem while assigned to Edwards. Petitioner has been continuously employed by Douglas since November 1949. During this period, petitioner has been continuously assigned to Douglas' testing division. He was classified as a flight test engineer from November 1949 to August 1958. In August 1958, petitioner was reclassified as a supervising flight test engineer, which did not involve new duties, but merely imposed upon him additional responsibilities as technical supervisor. It is customary in Douglas' testing division to organize the work on the basis of a project. From 1950 through May 1958, petitioner was assigned to the following principal projects at the location and approximate times indicated: Approximate
Project
Location
Dates
C-74 Transport
Santa Monica, Calif.
1950
C-74 Transport
Long Beach, Calif.
1950
C-47 Transport
Santa Monica, Calif.
1951
DC-6 Transport
Santa Monica, Calif.
1952
C-124 Transport
Wright Field, Dayton, Ohio
1952
C-124 Transport
Long Beach, Calif.
1952
C-124 Transport
Edwards AFB, Calif.
1952
A3D Bomber
Edwards AFB, Calif.
1952
DC-7 Transport
Palm Springs, Calif.
1954
RB-66A Reconnaissance
Long Beach, Calif.
Spring 1954
RB-66A Reconnaissance
Edwards, Calif.
July 1954
RB-66B Reconnaissance
Edwards, Calif.
Apr. 1955
B-66B Bomber
Edwards, Calif.
July 1955
RB-66C Electronic Countermeasures
Tulsa, Oklahoma
Oct. 1955
B-66 General
Edwards, Calif.
July 1956
C-133 Transport
Edwards, Calif.
Sept. 1956
F4D Fighter and A3D Attack Bomber
Edwards, Calif.
July 1957
A4D Light Attack Bomber
Edwards, Calif.
Feb. 1958
DC-8 Commercial Transport
Edwards, Calif.
May 1958
*227 Petitioner was married in 1951. When he was stationed at Edwards in 1952 he did not buy a house in the area. Prior to his assignment to Edwards on a 90-day travel order dated June 25, 1954, petitioner resided with his family in a rented apartment in West Los Angeles, which is adjacent to Santa Monica. When petitioner first arrived at Edwards in June 1954, he lived in Government quarters at Edwards until several weeks later, when he and his family moved into a house purchased at 44024 Elm in Lancaster. Before the 90-day travel order dated June 25, 1954, was issued by Douglas, petitioner contemplated the purchase of the home located at 44024 Elm in Lancaster. Upon arriving in the Edwards area, petitioner established a checking account with the Lancaster Branch of the Bank of America. On September 11, 1956, petitioner's wife registered to vote in Lancaster. Petitioner registered to vote in Lancaster in 1954 or 1956. In November 1956, petitioner sold his Granda Hills, California, home, purchased in 1953 with the intention of occupying it as a family residence. Petitioner and his family continued to reside at the home at 44024 Elm, Lancaster, California, until sometime in 1962, *228 when petitioner was reassigned by Douglas from Edwards to its plant in Long Beach, California. When petitioner was transferred from Edwards to Douglas' Long Beach, California, plant, petitioner moved his family to Costa Mesa, California, where petitioner purchased another home within a short time. After his initial assignment to Edwards in 1954, petitioner spent the following number of days away from Edwards during the indicated years: Year
No. Days
Location
1954
2
Los Angeles
1955
16
Tulsa
1955
5
Los Angeles
1956
34
Tulsa
1956
26
Los Angeles
1957
18
Los Angeles
1958
12
Los Angeles
Petitioner's claim for deduction of travel expenses of $252 for his 12 days in Los Angeles in 1958 was allowed in full in the deficiency notice. Apart from the time spent in Los Angeles, petitioner was not away from home on business in 1958. Opinion The parties agree that the question is whether petitioner meets the "away from home" test for deducting expenses under section 162(a)(2). [3]
*229 Petitioner maintains that his "principal post of duty was at Douglas' Santa Monica, California Plant" and that his work at Edwards was a series of temporary assignments. Respondent argues that, by 1958, petitioner's stay at Edwards was no longer temporary since "its termination within a fixed or reasonably short period of time" was not foreseeable. We agree with respondent's conclusion. During the disputed period (January 1 through August 25, 1958) petitioner worked at Edwards substantially the entire time. The same was true for the immediately preceding 3 1/2 years. Petitioner concedes that his assignment to Edwards was permanent on and after August 25, 1958. During the disputed period petitioner banked, voted, and owned a home near Edwards and neither owned nor rented a home elsewhere. Substantially all of his employment activities were at Edwards. No other place even arguably vies with the Edwards area as petitioner's home, in any sense of the word. Petitioner relies upon Harvey v. Commissioner, 283 F. 2d 491 (C.A. 9, 1960). In Harvey, the taxpayer had moved his family to Lancaster in October 1953. In January 1954 he was transferred away from Edwards. The Court *230 of Appeals stated ( id. at 495): The aim of the Congress was, apparently, "to equalize the burden between the taxpayer whose employment requires business travel and the taxpayer whose employment does not." The taxpayer who is away from home for short periods of time has the burden both of maintaining his home abode and of meeting the living expenses of his place of employment. It is not reasonable to expect the employee to dispose of his home every time the requirements of his employer's business necessitate his being away for an indefinite period of a few weeks or a few months; hence a special deduction is allowed to mitigate the burden which this taxpayer carries. * * * Manifestly, the fact pattern here is vitally different from that in Harvey. The Court of Appeals there sought to determine the taxpayer's reasonable expectations as of the start of the taxable year then before the court. The evidence we have summarized above conflicts with any reasonable expectation in December 1957 that petitioner would be transferred from Edwards to Santa Monica in 1958. Whatever the merits of the Harvey approach may be when the taxpayer, as there, spends 13 months in one place *231 and then returns to his former principal post, that approach is inapplicable to petitioner's 8-year stay at Edwards. Petitioner maintains that a "commitment" was made to him that no deficiency would be asserted for 1958 if he agreed to a settlement of tax disputes for prior years. Petitioner also argues that the Internal Revenue Service is not proceeding against other taxpayers for 1958 although the facts relating to the different taxpayers are similar to those relating to him. We have noted the factual differences between this case and Harvey. We have insufficient information in the record to support petitioner's claims of prior settlement (or of estoppel, if that be deemed implicit in his claim). Decision will be entered for respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩
2. The amount of the allowable medical expenses depends upon our resolution of the travel expense dispute.↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business * * *.↩